UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JAMES R. SIZELOVE,                        )
                                          )
                Plaintiff,                )
                                          )
        v.                                )        No. 1:19-cv-03659-SEB-TAB
                                          )
MADISON-GRANT UNITED SCHOOL               )
CORPORATION,                              )
STEVEN A. VORE,                           )
                                          )
                Defendants.               )

## ORDER ON PENDING MOTIONS

This cause is before the Court on Defendants' Motion for Summary Judgment
[Dkt. 58] filed on November 11, 2020, Plaintiff's Cross-Motion for Summary Judgment
[Dkt. 61], filed on December 21, 2020, Plaintiff's Motion to Strike Defendants'
Supplemental Brief [Dkt. 73], filed on January 31, 2022, and Defendants' Motion for
Leave to Serve Discovery [Dkt. 75], filed on March 14, 2022. Plaintiff James R. Sizelove
has brought this action under 42 U.S.C. § 1983 alleging that Madison-Grant United
School Corporation and Mr. Vore, in his individual and official capacities as Assistant
Superintendent, violated his First Amendment rights when he was administratively
suspended (with pay) based on comments he made concerning a school realignment
proposal for one week from his position as a bus driver and made subject to a directive
from Defendants not to make any further "negative or unfavorable" comments about the
school proposal. For the reasons detailed below, we GRANT IN PART AND DENY IN
PART Defendants' Motion for Summary Judgment [Dkt. 58], GRANT IN PART AND

DENY IN PART Plaintiff's Cross-Motion for Summary Judgment [Dkt. 61], GRANT

Plaintiff's Motion to Strike Defendants' Supplemental Brief [Dkt. 73] and DENY

Defendants' Motion for Leave to Serve Discovery [Dkt. 75].

## FACTS

The following facts are undisputed between the parties, unless otherwise noted.

### I.   General Background

Madison-Grant United School Corporation ("School Corporation" or "School") is

an Indiana public-school corporation that operates several schools in Madison and Grant

Counties. Am. Compl. ¶ 7. At all times relevant to the instant litigation, Mr. Scott Deetz

("Dr. Deetz") served as the Superintendent of the School Corporation, Mr. Steven A.

Vore served as its Assistant Superintendent, and Ms. Kristy Drewitz served as its

Transportation Director. Vore Dep. 6–8, 27–28. Mr. Vore, as a named defendant, is sued

in both his official and individual capacities. Am. Compl. ¶ 8. As Assistant

Superintendent, Mr. Vore supervises the School Corporation's food services,

maintenance, buildings and grounds, technology, and transportation departments. Vore

Dep. 8.

### A.  Mr. Sizelove's Employment History and Background

In August 2009, Mr. Sizelove was hired by the School Corporation as a bus driver

in which position he remained for over a decade while working on occasion for the

School as a substitute bus driver, security guard, and deejay at dances. *See* Sizelove Aff.

¶ 2; Sizelove Dep. Vol. 1 at 9–12, 22–23; Vore Dep. 11. Mr. Sizelove's responsibilities as

a bus driver included transporting students to and from school and ensuring the upkeep

and cleanliness of his school bus. Sizelove Aff. ¶ 2. At all times relevant to this litigation,

Mr. Sizelove also served as chief of the Summitville Fire Department where he had the

access to office space. *Id.* ¶ 3.

### B. Madison-Grant United School Corporation's Speech Policies

The School Corporation has in effect several policies concerning employee

speech. The School Corporation's Policy Manual contains a Staff Network and Internet

Acceptable Use and Safety Policy ("Acceptable Use Policy"), formally adopted by the

School Board, which states in relevant part:

> An employee's personal or private use of social media . . . may have
> unintended consequences. While the [School] Board respects its employees'
> First Amendment rights, those rights do not include permission to post
> inflammatory comments that could compromise the Corporation's mission,
> undermine staff relationships, or cause a substantial disruption to the school
> environment. This warning includes staff members' online conduct that
> occurs off school property including from the employee's private computer.
> Postings to social media should be done in a manner sensitive to the staff
> member's professional responsibilities.

Vore Dep. at 31–32, Ex. 6 at 4–6.

Although the terms of the Acceptable Use Policy specifically reference social-

media use, the policy is applied more broadly than "just social media." Vore Dep.

33.

The School Corporation has also promulgated a policy covering freedom of

speech in noninstructional settings ("Speech Policy"), which states:

> The School Board acknowledges the right of its professional staff members,
> as citizens in a democratic society, to speak out on issues of public concern.
> When those issues are related to the Corporation, however, the professional
> staff member's expression must be balanced against the interests of this
> Corporation.

3

The following guidelines are adopted by the [School] Board to help clarify and, therefore, avoid situations in which the professional staff member's expression could conflict with the Corporation's interests. In situations in which the professional staff member is not engaged in the performance of professional duties s/he should:

> A. state clearly that his/her expression represents personal views and not necessarily those of the School Corporation;
> B. not discuss with others any individual with whom s/he would normally be in daily contact in the performance of duties, in order to avoid the disruption of cooperative staff relationships;
> C. refrain from expressions that would disrupt harmony among co-workers or interfere with the maintenance of discipline by school officials;
> D. not make abusive or personally defamatory comments about co-workers, administrators, or officials of the Corporation;
> E. refrain from making public expressions which s/he knows to be false or are made without regard for truth or accuracy;
> F. not make threats against co-workers, supervisors, or Corporation officials.

Violation of these guidelines may result in disciplinary action up to and including termination.

Vore Dep. at 50–51, Ex. 9.

## II.   Elementary School Realignment Plan

In early 2017, the School Corporation undertook consideration of a plan to consolidate two elementary schools in the towns of Summitville and Fairmount: instead of having a school in each town that serves students from pre-kindergarten through the sixth grade, the proposed realignment plan would split the students into two schools: one school would enroll the pre-kindergarten through second grade children and the other school, the third grade through sixth grade children. Dkt. 62 at 3; Sizelove Aff. ¶ 4; *see also* Vore Dep. 17–18. The realignment plan required a vote of the Madison-Grant

4

School Corporation's School Board to take effect and thus became a topic of public conversation and debate over the course of two separate years: first in 2017, and again in 2019. Vore Dep. 19–20. Mr. Vore and Dr. Deetz supported the realignment plan from its inception, but Mr. Sizelove was vocal in his opposition to the plan, making public comments both in 2017 and 2019 that the School Corporation considered inappropriate. *Id.* at 19, 22–23.

Mr. Sizelove asserts that his opposition to the reorganization plan stemmed from his familial connections to the schools involved. *See* Am. Compl. ¶ 13. Both of Mr. Sizelove's children attended schools operated by the School Corporation when they were elementary school age, and his grandchildren will begin attending elementary school in the School Corporation during the next few years. *See id.* Mr. Sizelove maintains that the realignment plan would directly affect his family because his grandchildren will be required to attend two different elementary schools located in two different towns. *Id.*

### A.  Realignment Plan Proposal in 2017

Discussions regarding the realignment plan commenced in early 2017. The goal of the plan was to place similar grade levels in each designated school and reduce the number of bus drivers and bus routes. Vore Dep. 19; Sizelove Dep. Vol. 1 at 29. Several events occurring in April 2017 prompted the School Board to table discussions of the realignment plan and schedule a vote at a later time.

In early April 2017, the School Corporation's Transportation Supervisor, Ms. Kristy Drewitz, provided detailed bus schedules for the upcoming school year to Mr. Sizelove and at least one other bus driver. Sizelove Aff. ¶ 7. These schedules reflected

5

significantly longer routes for many of the bus routes. Mr. Sizelove understood that these bus schedules would take effect if the realignment plan were approved. *Id.* Around the same time, the School hosted multiple public forums to discuss the realignment plan in order to share information about the plan and to solicit feedback from the community. *Id.* at ¶ 8. These public forums were not formal School Board meetings, but members of the School Board were in attendance, including Dr. Deetz and Mr. Vore. *Id.*

At a public forum held on April 19, 2017, Mr. Sizelove voiced his opposition to the plan during the public comments period. Sizelove Aff. ¶ 9; *see* Vore Dep. 64. He opined that if the plan were adopted bus routes would be too long and too costly for the School Corporation, and that emergency personnel response times would be too long. Vore Dep. 24–26. During this public forum, according to Mr. Sizelove, Dr. Deetz reported that he had previously met with the School's bus drivers and that the bus drivers were "on board" with the proposed realignment. Mr. Sizelove regarded Dr. Deetz's statement as untrue because Mr. Sizelove knew that he, as well as various other bus drivers, were opposed to the plan and that Dr. Deetz had never met with the drivers personally to discuss their opposition. *Id.* ¶ 8.

In reaction to Dr. Deetz's statement, Mr. Sizelove signed an online Facebook petition titled "Stop the realignment plan for Madison Grant United School Corp." Sizelove Dep. Vol. 1 at 24–25, 63, Ex. 1. Under the "Reasons for signing" portion of the petition, Mr. Sizelove wrote: "Totally against this and as a bus driver we have NEVER MET with the Superintendent as he said in his presentation. Kids will be on my bus for 90 min [sic] each way." Sizelove Dep. Vol. 1, Ex. 2 (emphasis original).

Although the realignment plan had originally been scheduled for a vote during a subsequent public meeting on April 24, 2017, the School Board ultimately decided to table the vote in order to investigate the plan further. Sizelove Dep. Vol. 1 at 30; Vore Dep. 20. Three days later, on April 27, 2017, Mr. Sizelove was called into a meeting with Mr. Vore and Ms. Drewitz because the School Corporation believed his comments on the Facebook petition were inappropriate. Vore Dep. at 23, 27–28. Mr. Sizelove characterizes their meeting differently, claiming that Mr. Vore accused him of being the primary cause for the "failure" of the realignment plan and that he had "crossed the line" by signing the Facebook petition. Sizelove Aff. ¶ 12. The School Corporation maintains that the purpose of this meeting was to correct Mr. Sizelove's misinformation and to encourage him to limit his discussions about his concerns to internal communications with his supervisors. Vore Dep., Ex. 10 at 2. Mr. Vore testified that he and Ms. Drewitz explained to Mr. Sizelove the basis for their view that the information he had shared on Facebook was untrue, explaining that no final decisions had been made regarding transportation under the realignment plan. Vore Dep. 27–31. According to Mr. Vore, the School viewed this meeting merely as an opportunity to discuss the issue with Mr. Sizelove, noting that he was not formally disciplined in any way for the comments he made in 2017. *Id.* at 23; *see also* Vore Dep., Ex. 5 at 2.

### B.  2019 New Bus Routes and Renewed Realignment Plan Proposal

Two years later, in July 2019, the School Corporation began implementing changes to bus routes not based on the realignment plan but based on a newly enacted state law which mandated that bus routes located on state highways be adjusted to ensure

that students were picked up by the school buses immediately outside of the students' homes to prevent students from having to cross lanes of high speed traffic moving along the highway. Deetz Decl. ¶ 2; Dkt. 58 at 7. The new law was discussed during the School Board's July 29, 2019 meeting, which session Mr. Sizelove did not attend. *See* Deetz Decl. at 4; Sizelove Dep. Vol. 2 at 116–17. Mr. Sizelove testified that he recalled that Ms. Drewitz had at one time explained this new law but noted that his route was not impacted by the changes. Sizelove Dep. Vol. 2 at 116–17. In early August 2019 Mr. Sizelove's son's brother-in-law, who is the Vice President of the Madison-Grant Teacher's Association, informed him that the realignment plan proposal was scheduled to be brought up again and this time had enough support from members of the School Board to ensure its passage, thus making it a "done deal." Sizelove Aff. ¶ 14.

### C.  Mr. Sizelove's 2019 Statements Concerning Realignment

The aforementioned events gave rise to Mr. Sizelove's statements which underlie the issues in this First Amendment case. On August 12, 2019, an informal discussion occurred at the Summitville Fire Department firehouse involving Mr. Sizelove, two other persons who worked for the fire department, and the Township Trustee for Van Buren Township, Ms. Amos, who was present because she also had an office in the building. *See id.* ¶ 15. The parties' versions of this conversation vary in certain respects.

Mr. Sizelove maintains that Ms. Amos joined the conversation late, after she overheard Mr. Sizelove talking to other fire department employees in his office. *Id.* Prior to Ms. Amos joining the conversation, according to Mr. Sizelove, he and the fire department employees were discussing the realignment plan, during which conversation

Mr. Sizelove reiterated his opposition to the school realignment plan, sharing his belief that implementation of the plan would adversely impact the school's students, its employees, and the local community. *Id.* He also stated his specific concerns about the length of the bus routes under the plan, questioning as well whether both elementary schools would be in areas covered by local emergency services. *Id.* He contends that during this conversation, the assistant chief of the fire department remarked, "I heard it's already a done deal," to which Mr. Sizelove responded, "Yep, I've heard they already got the votes in the store." *Id.*; Sizelove Dep. Vol. 1 at 34–35. Mr. Sizelove asserts that Ms. Amos joined the conversation after she apparently had overheard this part of the conversation. Sizelove Aff. ¶ 15. Mr. Sizelove attests that at no time did he specifically state that the School Board had already met and voted on the proposal. *Id.*

Ms. Amos testified (by submitted Declaration) that Mr. Sizelove stated that (1) the School Board had already approved realignment even though it had not yet held a public meeting, and that (2) the School was changing bus routes during the summer of 2019 to conform them with the realignment plan. Amos Decl. ¶¶ 8–10. Soon after this conversation, Ms. Amos contacted the School Board President, Mary Jo Brunt, and relayed to her the comments she recalled Mr. Sizelove having made during this conversation. *Id.* ¶ 11.

### D. The School Corporation's Response to Mr. Sizelove's Statements

Having received Ms. Amos's report on Mr. Sizelove's comments, Ms. Brunt passed the information along to Dr. Deetz, who in turn conveyed it to Mr. Vore. Vore Dep. 37–42; *see also* Amos Decl. ¶ 11. Mr. Vore testified that having learned of these

comments, he assumed Ms. Amos had actually been present when they were made, but he was not certain that that was actually the case. Vore Dep. 40. In any event, the School Corporation came to view Mr. Sizelove's statements as false, that they challenged the legitimacy of the School Board by suggesting that decisions were being made outside of public meetings, and that in spreading this information they undermined the public's ability to accurately evaluate the realignment plan. *See id.* at 41–46, 62.

Accordingly, on August 16, 2019, a meeting was convened involving Mr. Vore, Ms. Drewitz, and Mr. Sizelove to address Mr. Sizelove's statements, Sizelove Dep. Vol. 1 at 38; Vore Dep. 44–45, during which the School provided to Mr. Sizelove a "Notice of Paid Administrative Leave," explaining that he was being placed on paid administrative leave from August 19, 2019 through August 25, 2019. Vore Dep., Ex. 8. The letter stated, in relevant part, that:

> . . .
>
> On April 27th, 2017, we conducted a meeting that involved Mr. Vore, Mrs. Drewitz, and Mr. Sizelove. During this meeting we discussed the level of professionalism required by those who are employed by the Madison-Grant United School Corporation. We also discussed making disparaging remarks about the administration or the MGUSC School Board. During this meeting we discussed repercussions involved with continued dialogue could result [sic] in disciplinary action. The events in question were directly related to the possibility of school reconfiguration and Mr. Sizelove's opinion of administrative decisions.
>
> During the week of August 12, 2019 the MGUSC School Board members had been notified of additional comments made by Mr. Sizelove in reference to renewed discussions involving reconfiguration of schools. It is the opinion of the administration of Madison-Grant United School Corporation that this continued lack of respect and blatant disregard to the expectations of an employee of MGUSC will not be tolerated.

Effective August 19th, 2019, you will be placed on paid administrative leave. At the end of your route on August 16th, 2019 you will be required to bring your bus to the MGUSC Bus Barn and relinquish all keys. You will resume duties on August 26th, 2019 by picking up your bus at the MGUSC Bus Barn before your morning route.

If any of the following instruction needs further clarification we would be happy to discuss the requirements with you. **Any additional comments made that are considered negative or unfavorable could result in termination of employment.**

Sizelove Aff., Ex. 1; Vore Dep., Ex. 8 (emphasis added).

The decision to place Mr. Sizelove on paid administrative leave was made by Mr. Vore and Dr. Deetz. Vore Dep. 43–44. According to the School, Mr. Sizelove's comments violated its Acceptable Use Policy and its Speech Policy[1] and caused "a trickle-down effect [on] school morale." *Id.* at 42, 47, 51–53. Despite being placed on administrative leave, Mr. Sizelove was nonetheless required to drive his afternoon bus route that day, because his suspension did not officially take effect until the following week. Sizelove Aff. ¶ 21. Ms. Drewitz escorted him on that afternoon route, explaining to the children from time to time that Mr. Sizelove would not be working the following week because he was "taking some time off" or because he needed a vacation. *Id.* At the conclusion of his route, Ms. Drewitz drove with Mr. Sizelove to his home before shuttling his bus on to the designated parking area at the school. Mr. Sizelove describes

---

[1] The School contends that Mr. Sizelove's comments violated several provisions of the Speech Policy, including: (a) the requirement that an employee "state clearly" that his expression represents only personal views (subsection A); (b) the prohibition on expressive activity that would "disrupt harmony among co-workers or interfere with the maintenance of discipline" (subsection C); (c) the prohibition on "abusive or personal defamatory comments" about school officials (subsection D); and (d) the prohibition on making public expressions that are known to be false or without regard for truth or accuracy (subsection E). Vore Dep. 52–53.

this experience of being "forced to walk out of the school bus, in front of [his] family, while the red lights were flashing and the 'stop-arm' on the school bus was extended" as humiliating to him. *Id.*

Mr. Sizelove contends that having Ms. Drewitz accompany him on his afternoon route was also embarrassing and humiliating since it occurred in the presence of the school children as well. *See, e.g.*, *id.* He describes his suspension as having been damaging to him emotionally, causing him to feel like the School Corporation was out to get him, that he could not speak his mind, and that his reputation in the town had been damaged, as evidenced by a rumor that began circulating to the effect that he was suspended for hitting a child on his bus. This incident also brought him stress, headaches, and a loss of appetite. Sizelove Dep. Vol. 1 at 52–53; Sizelove Dep. Vol. 2 at 140–143. He became depressed, could barely eat, lacked energy, was unable to take his mind off of the issue or concentrate on other matters, and felt that he was walking around with a "gigantic lump in [his] stomach." Sizelove Aff. ¶ 22.

### E.  2019 Realignment Plan Vote and Approval

On August 26, 2019, the same day Mr. Sizelove returned to work after his paid week of administrative suspension, the School Board met to reintroduce and discuss the realignment plan; however, a final vote was again delayed. *Id.* at 21–22, Ex. 3. Even though Mr. Sizelove had returned to work, he chose not to attend the School Board meeting for fear he might be disciplined if he were to attend any School Board meetings concerning realignment. *See* Am. Compl. ¶ 23. Two days later, on August 28, 2019, Mr. Sizelove filed this lawsuit alleging that Madison-Grant United School Corporation and

Mr. Vore, acting in both his individual and official capacities as Assistant Superintendent, violated his First Amendment rights by suspending him and in prohibiting him from making any further comments that the School Corporation would regard as "negative or unfavorable."

On September 23, 2019, the School Board met and voted to approve the realignment plan; Mr. Sizelove was not in attendance at that meeting. Vore Dep. 21–22, Ex. 4; Sizelove Dep. Vol. 2 at 134. The realignment plan became effective at the beginning of the 2020 academic school year. Vore Dep. at 17.[2]

## EVIDENTIARY OBJECTIONS

As an initial matter, the Court must take up and resolve an array of evidentiary disputes that have been raised by and between the parties. In support of his cross motion for partial summary judgment, Mr. Sizelove has submitted his own affidavit. Defendants object to various statements included in Mr. Sizelove's affidavit, describing them either as inadmissible hearsay or factual assertions beyond Mr. Sizelove's personal knowledge, improper legal conclusions, or assertions that contradict his prior testimony. Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on

---

[2] Mr. Sizelove was terminated on April 30, 2020, approximately eight months after his speech-related paid administrative suspension. His termination was not based on his speech-related activities. Rather, he was terminated after the School Corporation was informed of an Indiana State Police investigation into allegations of sexual impropriety between Mr. Sizelove and a minor. Vore Dep. at 14–15.

the matters stated." All evidence submitted in support of a motion for summary judgment must generally be admissible at trial and a court must not consider parts of an affidavit that fail to comply with Fed. R. Civ. P. 56(c)(4). *See Eli Lilly and Co., v. Arch Ins. Co.*, No. 1:13-cv-01770, 2017 WL 2930571, at *6 (S.D. Ind. July 10, 2017); *Bitler Inv. Venture II, LLC v. Marathon Ashland Petroleum, LLC*, No. 1:04-cv-477, 2011 WL 1296167, at *3 (N.D. Ind. Mar. 31, 2011).

We address Defendants' objections below prior to resolving the parties' substantive arguments put forward in their cross-motions for summary judgment; these evidentiary rulings obviously impact the admissibility of various assertions on which the cross-motions are based.

## I.   Hearsay Objection

Defendants object to paragraph 14 of Plaintiff's affidavit as inadmissible hearsay. Paragraph 14 states:

> In early August 2019, I learned from my son's brother-in-law that the proposal was being considered again. Specifically, he shared with me the fact that the proposed reconfiguration would almost certainly take effect in the near future, that it already had the support of enough members of the school board of the School Corporation to ensure its passage, and that reconfiguration was therefore a 'done deal.'

Sizelove Aff. ¶ 14.

Hearsay is defined as an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). "Whether a statement is hearsay and, in turn, inadmissible, will most often hinge on the purpose for which it is offered." *Wilson v. Republic Airways Holdings, Inc.*, No. 1:13-cv-01548, 2015 WL 1564988, at *4 (S.D. Ind.

Apr. 8, 2015) (quoting *United States v. Linwood*, 142 F.3d 418, 424 (7th Cir. 1998) (internal quotation marks omitted)). Out-of-court statements offered to show the effect on the listener's state of mind and to establish the sequence of events leading up to the matter at issue are permissible grounds for admission. *Id.*; *see also Pugh v. City of Attica*, 259 F.3d 619, 627 n.7 (7th Cir. 2001) (holding that an out-of-court statement offered to prove employer's honest belief that plaintiff had misappropriated funds was not hearsay).

Defendants assert that Mr. Sizelove's statement regarding what his son's brother-in-law told him is inadmissible hearsay. Mr. Sizelove rejoins that this objection is not well taken because the statement is not offered to prove the truth of the matter asserted, but to demonstrate Mr. Sizelove's knowledge at the time the realignment, namely, that it was a "done deal."[3]

We rule that the statement in paragraph 14 is admissible as nonhearsay because it is offered not for the truth of the matter asserted, but to establish the sequence of events that led to Mr. Sizelove's statements and to explain his knowledge giving rise to his statements/reaction(s) during the conversation at the firehouse. *See, e.g.*, *United States v. Linwood*, 142 F.3d 418, 425 (7th Cir. 1998) (allowing testimony that the defendant sold drugs out of their apartment not to prove the truth of the matter asserted, but to establish why the defendant reacted as she did upon hearing the statement). Accordingly, Defendants' objection to paragraph 14 is overruled.

---

[3] As discussed further below, Defendants must establish Mr. Sizelove's state of mind at the time the contested statements were made in order to succeed on summary judgment. Mr. Sizelove's testimony in paragraph 14 is offered to establish his state of mind at the time he made the statements that Defendants assert lack constitutional protection.

## II.   Lack of Personal Knowledge Objection

Defendants object to paragraphs 4, 13, 18, 21, and 23 of Mr. Sizelove's affidavit on the grounds that the statements expressed therein are not based on his personal knowledge."[S]tatements outside the affiant's personal knowledge or statements that are the result of speculation or conjecture or merely conclusory" do not meet the admissibility requirements for affidavits under Federal Rule of Civil Procedure 56(c)(4). *Strong v. Delaware Cnty.*, 976 F.Supp.2d 1038, 1043–44 (S.D. Ind. 2013) (quoting *Stagman v. Ryan*, 176 F.3d 986, 955 (7th Cir. 1999) (internal quotation marks omitted)). Generally, a witness may only testify concerning matters about which that witness has personal knowledge and only if there is sufficient evidence to support the witness's personal knowledge as to that matter. Fed. R. Evid. 602. Each of Defendants' specific objections is addressed below.

### *Paragraph 4*

Paragraph four of Mr. Sizelove's affidavit states:

I am aware that this proposed reconfiguration plan generated a significant amount of controversy, as many parents did not wish to send their children to school in a different town and were concerned that the plan would cause them to lose touch with their neighborhood schools. The plan was incredibly important to our local community as persons recognized that, if it took effect, it would dramatically affect the manner in which the School Corporation provided education to students within its jurisdiction.

Defendants assert that Mr. Sizelove's comments as to what other parents "wished" for, were "concerned" with, and the importance of the plan to the community are inadmissible as assertions of others' views beyond Mr. Sizelove's personal knowledge. In addition, they object because no foundation has been laid for his knowledge of these

matters. Mr. Sizelove responds that paragraph 4 reflects his own, personal understanding of the community's concerns, buttressed by the fact that the School itself had acknowledged in its deposition testimony that it was aware of community opposition to the realignment plan because parents had expressed their opposition to sending their children to school in a different town. Vore Dep. at 5.

We hold that the first clause in paragraph 4 is admissible, but the remainder must be excluded. Mr. Sizelove's testimony that he was "aware that this proposed realignment plan generated a significant amount of controversy" is based on his own observations and knowledge. Mr. Sizelove has produced evidence sufficient to show that he was aware of and involved in opposition efforts to the realignment plan and, indeed, the School itself has admitted that Mr. Sizelove attended public forums where the proposed plan was actively debated. Thus, the evidence presented (by both sides) illustrates that Mr. Sizelove was personally aware that a controversy existed, and he can testify accordingly.

Mr. Sizelove's remaining statement as set out in paragraph 4 of his affidavit references the thoughts of other parents and "persons"—their concerns and priorities—including that the plan was "important" to the community. These statements are inadmissible as they reflect matters outside of Mr. Sizelove's personal knowledge and for which no foundation was provided as to his personal knowledge. *Cosby v. City of Indianapolis*, No. 1:17-cv-04201-JMS-MPB, 2019 WL 367896, at *2 (S.D. Ind. Jan. 30, 2019) (excluding statement from police officer that purported to comment on what "most officers wanted" given that officers are spread throughout many zones and districts). The record before us provides no evidence as to the specific topics addressed during the

17

public forums Mr. Sizelove attended. Even so, his statements that certain unnamed "persons" recognized the importance of the plan and its dramatic effect on the education of students exceeds Mr. Sizelove's personal knowledge. Thus, the remaining portions of paragraph 4 must be and are excluded.[4]

***Paragraph 13***

In paragraph 13 of Mr. Sizelove's affidavit, he attests that his son's brother-in-law "often receives information from teachers, administrators, school board members, or others within the School Corporation with whom he interacts regularly." Defendants object to this statement as referencing matters outside of Mr. Sizelove's personal knowledge and lacking foundation. Mr. Sizelove rebuts Defendants' objection, contending that this statement reflects the reliability he attaches to his son's brother-in-law's statement and to explain his resultant mental state when he accepted the statements as true. As such, for that limited purpose, we find it admissible and overrule the objection.[5]

***Paragraph 18***

In paragraph 18 of the affidavit, Mr. Sizelove states that "[m]y comments certainly did not affect . . . other drivers' ability to continue serving the School Corporation and its

---

[4] As Mr. Sizelove notes, the School has acknowledged that it was aware of community opposition to the realignment plan in its deposition testimony. Thus, any detailed discussion by the Court relating to community opposition included in our analysis is appropriate based on the deposition testimony of School officials rather than Mr. Sizelove's affidavit. *See* dkt. 68 at 2 n.1.

[5] We find Plaintiff's analogy to probable-cause determinations wherein officers' statements concerning the reliability of confidential informants when those statements are based on the officers' experiences to be inapt. *See Bitler Inv. Venture II, LLC*, 2011 WL 1296167, at *1–2.

students." Defendants object to this statement on the grounds that it is conclusory and speculative regarding the effect of his statements on other bus drivers' abilities to continue serving the School and is beyond anything that he knows based on his personal knowledge. Mr. Sizelove responds that this statement is offered to explain his impressions and conclusions based on his experiences as a bus driver for the School.

If offered to establish the literal truth of the statement—that his statements did not impact all the other bus drivers employed by the School—there is no foundational evidence to support the admissibility of such an assertion. However, as evidence explaining Mr. Sizelove's personal observations or conclusions or opinions, it is admissible. The Court will allow the evidence to be received for that limited purpose.[6] The objection to that extent is overruled.

### Paragraph 21

In paragraph 21, Mr. Sizelove discusses events occurring on the afternoon he was placed on administrative leave. He states that Ms. Drewitz escorted him during his afternoon bus route and informed the children, more than once, that he would not be driving their bus the next week because he was taking some time off or needed a vacation. Defendants object to the portion of this paragraph that states: "I could tell that her explanations were raising more questions for the children on my route than they were answering." Defendants object to this statement as a reference to the mental state of the

---

[6] We note that in its deposition testimony, the School acknowledged that it was unaware of any specific incidents or ways in which Mr. Sizelove's comments affected its operations. Vore Dep. at 12. Thus, the evidence relating to the effect of Mr. Sizelove's comments on School Corporation employees is admissible as well based on School's own deposition testimony.

children on his bus, a matter outside his personal knowledge. Mr. Sizelove again proffers this as evidence of his observations and interpretation of events occurring in his presence.

For that purpose, Mr. Sizelove's statement in paragraph 21 is admissible. It is based on his first-hand observations of the children's reactions to Ms. Drewitz's presence when she escorted him on his bus route, which were, in Mr. Sizelove's mind, signs that the children were confused by Ms. Drewitz's statements. *See Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452, 454 (7th Cir. 2015) (stating that "personal knowledge can include inferences"); *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999) ("Because most knowledge is inferential, personal knowledge includes opinions and inferences grounded in observations or other first-hand experiences."). This is admissible evidence. The objection is overruled.

### Paragraph 23

In paragraph 23, Mr. Sizelove recounts a rumor that was spread concerning the basis for his suspension. Defendants object to the portion of this paragraph that states: "I believe all of these problems were aggravated by the fact that I live in a small community and that I am well known throughout the community." Defendants object on the grounds that Mr. Sizelove's explanations were speculative and outside his personal knowledge.

This testimony reflects Mr. Sizelove's understanding based on his own observations and experiences in his community, about which he has first-hand knowledge. Mr. Sizelove was chief of the Summitville Fire Department in addition to his duties as a bus driver with Madison-Grant School Corporation. While the statement has limited relevance to the issues before us, we hold that this part of paragraph 23 regarding

Mr. Sizelove's observations concerning how life unfolds in a small community is admissible. This objection is also overruled.

### III.   Statements Contradictory of Prior Testimony Objection

Defendants rely on the "sham-affidavit" rule to object to aspects of Mr. Sizelove's affidavit which allegedly contradict his prior deposition testimony. The sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn testimony." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (citing *Dunn v. Menard, Inc.*, 880 F.3d 899, 910 (7th Cir. 2018)). The rule must be applied with "great care" because "summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry University, Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Every correction of memory failure or variation in a witness's testimony does not require that an affidavit be excluded as sham. *See id.* at 571–72. Rather, "an affidavit can be excluded as sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Id.* at 572. (quoting *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996)).

Defendants specifically object to excerpts found in paragraphs 15, 22, and 23 in Mr. Sizelove's affidavit. We address each objection in turn below.

### *Paragraph 15*

Mr. Sizelove states that "[a]t no time did I indicate that the school board had already met and voted on the proposal."

Defendants assert that this statement is contradicted by Mr. Sizelove's prior deposition testimony "where he testified under oath that he did indeed say that the School

Board already approved realignment prior to the public meeting," [Dkt. 67 at 4 (citing Sizelove Dep. Vol. 1 at 34)], referencing the following exchange: "Q: Did you have any conversations regarding whether the board had already approved -- prior to the public meeting, did you have that conversation with anybody else other than [two firefighter coworkers]? A: No, not -- *we was [sic] all in my office when that was said*." Sizelove Dep. Vol. 1 at 34 (emphasis added). Mr. Sizelove maintains that this deposition statement has been taken out of context, that the testimony referenced by Defendants was immediately followed by his clarification of the details surrounding his conversation with Ms. Ames,[7] wherein he stated that his assistant chief at the fire department had said "I heard [realignment] is already a done deal," to which Mr. Sizelove replied "Yep, I've heard they already got the votes in store." Our review of the entirety of the deposition excerpt establishes that no direct contradiction exists between Mr. Sizelove's prior deposition testimony and the contested statement in his affidavit. Paragraph 15 is thus admissible and need not be stricken.

***Paragraph 22***

In paragraph 22, Mr. Sizelove states:

---

[7] The deposition testimony, in full, stated: "Q: Did you have any conversations regarding whether the board had already approved – prior to the public meeting, did you have that conversation with anybody else? A: No, not – we was all in my office when that was said. And then the Van Buren township trustee heard, and she came in and said, 'What do you mean?' * * * Q: So you said she had heard your comment about saying the board has already approved the reconfiguration prior to the public meeting. She said, 'What are you talking about,' and came into the room? Is that how it went? A: How it exactly went was, my assistant chief said, 'I heard it's already a done deal.' And I said, 'Yep, I've heard they already got the votes in the store,' and that's what I told him. 'I heard they already got the votes in the store.' And she jumped up because she's against it, she ran into my office or walked into my office and asked me what the heck we was talking about. And all three of us sat there." Dkt. 60-2 at 34–35.

I became depressed and I could barely eat as a result of the ordeal. For the vast majority of my suspension, I felt like I did not have any energy and was unable to find activities to keep myself occupied and to try to take my mind off of the issue. I therefore spent most of the week simply sitting around my house unable to concentrate on anything. For weeks afterward, I felt like I was walking around with a gigantic lump in my stomach.

Defendants characterize these statements as contrary to Mr. Sizelove's prior deposition testimony in which, they allege, Mr. Sizelove's damages claim is limited to the feeling that the School Corporation was out to get him which caused him to suffer from a diminished appetite, which harmed his reputation, which caused him sadness in being away from the students and which caused him to suffer stress, anger, and headaches. Sizelove Dep. Vol. 1 at 56–57; Sizelove Dep. Vol. 2 at 128–29, 140. Defendants note that Mr. Sizelove never stated that he was depressed, had no energy, was unable to pursue activities, unable to concentrate, or had a lump in his stomach. This inconsistency, they contend, warrants striking these statements in the affidavit. In response, Mr. Sizelove places the blame for the inconsistency on defense counsel's overly broad questions put to him during his deposition. Our review discloses no inconsistency: Mr. Sizelove, in both contexts, has testified to the emotional toll that resulted from his paid administrative suspension from his bus driver duties.

"[S]ummary judgment is not a tool for deciding questions of credibility." Any variation(s) between Mr. Sizelove's deposition testimony and his affidavit do not support a characterization of the affidavit as a sham. *Castro*, 786 F.3d at 571–72. Defendants are correct that Mr. Sizelove did not explicitly reference some of the effects he experienced (*i.e.*, depression) in his deposition, but others were included, *i.e.* his stress, anger, and

headaches. Accordingly, Mr. Sizelove's statements in paragraph 22 need not be stricken and the objection is overruled.

***Paragraph 23***

Defendants object to two aspects of paragraph 23: First, Mr. Sizelove's statement regarding the rumor that he hit a child, about which Mr. Sizelove's affidavit states, "I heard the rumor from two separate sources: from the President of the Parent-Teacher Organization at Summitville Elementary School (who indicated that a teacher at that elementary school had informed her of the rumor) and from another school bus driver." Defendants challenge this statement as contradictory of Mr. Sizelove's prior deposition testimony where he attributed the rumor to the President of the Parent-Teacher Organization ("PTO") but not to another school bus driver.[8] This inconsistency would, at best, go to the weight of the testimony not its admissibility; in any event, it does not convert the affidavit into a sham submission. Mr. Sizelove maintains that any differences between his deposition and his affidavit reflect predictable lapses in recollection, not an inconsistency driven by an intentional contradiction. We find these differences to be inconsequential.

Mr. Sizelove's second averment contained in his affidavit was this: "To say the least, I felt completely humiliated by the fact that persons were even talking about this possibility . . . ." Sizelove Aff. ¶ 23. Defendants assert that in Mr. Sizelove's deposition

---

[8] Defendants quote Mr. Sizelove's deposition testimony in support which stated: "Q: Do you know who that was told to, other than, of course, yourself? A: I just got it from [President of Parent-Teacher Organization]. I have no idea who else." Sizelove Dep. Vol. 1 at 57.

testimony he testified that he was not humiliated by the suspension with pay. *See* Sizelove Dep. Vol. 2 at 125. However, Mr. Sizelove's affidavit refers to his feeling humiliated due to the rumor going around town, not because of his suspension. Given this explanation, Defendants' objection is overruled.

### IV.    Objections Based on Legal Conclusions

Defendants object to paragraph 16 of the affidavit regarding the firehouse conversation. Mr. Sizelove testified that "[d]uring this conversation, I was speaking only for myself in my capacity as a private citizen and was not speaking in my capacity as an employee of the School Corporation." Defendants argue that this statement constitutes an impermissible legal conclusion. Plaintiff maintains that this statement was not legal conclusion; it was merely a fact reflecting that when he made the statement he was located at the fire department and was on his own time and not speaking as a school employee. As such, the statement is admissible; it is not an impermissible legal conclusion. The objection is overruled.

## ANALYSIS

### I.    Standard of Review

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate

the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

Courts often confront cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief. In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *Kohl v. Ass'n. of Trial Lawyers of Am.*, 183 F.R.D. 475 (D. Md. 1998). Here, the Court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 574 (1986).

## II.   Discussion

Mr. Sizelove's First Amendment claim advances two speech-related issues: (1) whether Mr. Sizelove's paid administrative suspension prompted by comments he had made at an informal gathering at the Summitville firehouse, which statements were passed along to the School Corporation by Ms. Amos, violated his First Amendment rights; and (2) whether Mr. Sizelove's administrative leave notice which included a prohibition on his future speech to the extent it would be negative or unfavorable to the School violated Mr. Sizelove's free-speech rights. Defendants seek summary judgment on all claims raised in Mr. Sizelove's Amended Complaint. Mr. Sizelove has cross-moved for summary judgment on his claim that Defendants are liable for these violations of his

First Amendment rights and is entitled to an injunctive order requiring the School to expunge and/or rescind the disciplinary action taken against him.[9] We begin our analysis with a review of the constitutionality of Mr. Sizelove's suspension followed by consideration of the prior restraint issue.

### A.  Mr. Sizelove's Administrative Suspension Violated His First Amendment Rights

Mr. Sizelove maintains that Defendants violated his First Amendment rights by suspending him for having engaged in protected speech. To establish a First Amendment retaliation claim, a public employee must prove that: (1) his speech was constitutionally protected; (2) he has suffered a deprivation likely to deter speech; and (3) his speech was at least a motivating factor in the employer's action. *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (citations omitted). Only the first element—whether Mr. Sizelove's statements were constitutionally protected—is in dispute here.

Whether a public employee plaintiff's speech was constitutionally protected is a question of law for the court. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). "For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Swetlik*, 738 F.3d at 825 (quoting *Houskins v. Sheahan,* 549

---

[9] Mr. Sizelove requests that, if he prevails on his partial summary judgment motion, his monetary damages be determined in a future setting.

F.3d 480, 490 (7th Cir. 2008)). The third element is referred to as *Pickering* balancing. *See Pickering v. Board of Education*, 391 U.S. 563 (1968).

The parties do not dispute the first or second elements: Mr. Sizelove's speech took place during a private conversation with acquaintances who were non-School employees and occurred on his own time away from the work premises and clearly addressed a matter of public concern. [10] *See* dkt. 62 at 13 n.4; dkt. 68 at 5; *see also Kristofek v. Village of Orland Hills*, 832 F.3d 785, 792–796 (7th Cir. 2016).

The third element—requiring the *Pickering* balancing—is disputed here. Defendants assert that Mr. Sizelove's statements are not protected by the First

---

[10] We note that Defendants filed a Submission of Supplemental Authority in Support of Motion for Summary Judgment [Dkt. 71] on January 24, 2022, in which they identify a recent Seventh Circuit decision addressing a public employment First Amendment issue. *See Sweet v. Town of Bargersville*, 18 F.4th 273 (7th Cir. Nov. 17, 2021). In *Sweet*, the Seventh Circuit found that a public employee who managed disconnections on overdue utility accounts did not engage in constitutionally protected speech when she criticized the town's clerk-treasurer for reconnecting the utility service of a delinquent customer who also happened to be the clerk-treasurer's wealthy business partner. Plaintiff was terminated five months after she voiced her criticism and subsequently brought a First Amendment retaliation claim. *Id.* at 277. By filing this submission of supplemental authority, it appears that Defendants seek to raise an argument (for the first time) that Mr. Sizelove's statements were made pursuant to his official responsibilities rather than as a private citizen. Defendants assert that by stating that bus routes were changing in summer 2019 to conform to the proposed realignment plan, Mr. Sizelove "criticized Defendants for how they allegedly handled an aspect of his job responsibilities," just like the Plaintiff in *Sweet*. Dkt. 71. We find that *Sweet* is easily distinguishable from our case as *Sweet* involved a plaintiff who directly criticized her superior for unfairly favoring the wealthy business partner when he reconnected the partner's delinquent services followed by the plaintiff's sharing of that criticism to others in the office. Plaintiff argued that she was not speaking pursuant to her official duties because it was "not her job" as a low-level employee to confront a high-ranking superior about questions of policy. *Sweet*, 18 F.4th at 278. In contrast, Mr. Sizelove was a bus driver who, during a private conversation, allegedly stated that bus routes were changing to conform to the School's realignment plan. Mr. Sizelove's statement occurred in a private conversation with three other individuals away from his place of work on his own time. Mr. Sizelove had no management role in designing transportation routes or coordinating a realignment proposal for the School Corporation. Thus, we find these facts easily distinguishable and will not address the recent Seventh Circuit decision further.

Amendment because: (1) they were false, disparaging, and/or made with reckless disregard for the truth [Dkt. 59 at 13–16]; and (2) even if the statements constitute protected speech, the speech loses its protection under *Pickering* as the School Corporation's interest as an employer in promoting effective and efficient public service outweighs Mr. Sizelove's interest in expressing his speech. *See* dkt. 59 at 16–19. Mr. Sizelove rejoins that he did not believe his statements were false, and at the very least, he did not make these statements in reckless disregard of the truth, that the statements did not rise to anywhere close to the level required to constitute "disparaging" speech, and that his interest in commenting on a matter of public concern/controversy far outweighs the School Corporation's interests under these circumstances. We address each argument in turn below.

### i.   Mr. Sizelove's Comments Were Not Made With Knowledge of Falsity or In Reckless Disregard of the Truth and Were Not Disparaging

The Court in *Pickering* suggested that an employee's statements may fail the test and not warrant protection if they were false and made with knowing or reckless disregard for the truth. *Pickering,* 391 U.S. at 574. The Seventh Circuit has since held that an employee's speech is not protected where it is made with a reckless disregard for the truth. *See Swetlik*, 738 F.3d at 827; *Brenner v. Brown,* 36 F.3d 18, 20–21 (7th Cir.1994). Thus, even if a public employee's speech addresses a matter of public importance/concern, it loses its First Amendment protection "if the public employee *knew* it was false or made it in reckless disregard of the truth." *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 942 (7th Cir. 2004) (emphasis added); *see also*

*Pickering,* 391 U.S. at 574 ("[A]bsent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." (footnote omitted)); *Brenner,* 36 F.3d at 20 ("[A]n employee's speech is not protected where it is . . . made with a reckless disregard for the truth, or is otherwise profane and disparaging."). It is the governmental employer's burden to establish that the public employee knew or was recklessly indifferent to the fact that his speech was false. *See Gazarkiewicz*, 359 F.3d at 942 (quotation omitted).[11]

Defendants assert that Mr. Sizelove's First Amendment claim fails as a matter of law because his comments were false, made in reckless disregard of the truth, and disparaging. Mr. Sizelove disagrees with each of these characterizations.

First, Defendants contend that Mr. Sizelove's statement that realignment had already been approved is objectively false because at the time the comment was made, the School Board had not yet voted on whether it would pursue the realignment plan. Defendants maintain that Mr. Sizelove knew this statement was false (or certainly was recklessly indifferent to its falsity) because realignment had not even been reintroduced for discussion by the School Board until its August 26, 2019 meeting and was not

---

[11] Defendants assert that Mr. Sizelove has asked this Court to adopt an "unrecognized element—actual malice" in the First Amendment analysis. Dkt. 67 at 10. The purpose of Defendants' argument is unclear. Mr. Sizelove's briefing referred to the standard set out in *Gazarkiewicz*, *Pickering*, *Brenner*, and *Swetlik* as the "actual malice standard." Dkt. 62 at 14–15. If anything, Mr. Sizelove has simply used a different term to describe the same standard. In any event, all parties agree that the determinative question before the Court is whether Mr. Sizelove made the comments at issue knowing they were false or in reckless disregard of the truth. *Gazarkiewicz*, 359 F.3d at 942.

formally approved by public vote until a subsequent meeting on September 23, 2019—

both of which occurred well after Mr. Sizelove made his statement. As noted, Mr.

Sizelove recounts the details of this statement somewhat differently, explaining that he

never stated that the School Board had already met and voted on the proposal; rather, as

he testified, one of the fire department employees remarked that he had heard the

realignment plan was already "a done deal," to which Mr. Sizelove responded, "Yep, I've

heard they already got the votes in store." Mr. Sizelove maintains that, in any event, any

divergence between the parties' versions of the conversation is a "distinction without a

difference, for the sentiment is one and the same: Mr. Sizelove expressed his

understanding that school reconfiguration was a foregone conclusion." Dkt. 62 at 16.

Thus, Mr. Sizelove contends that his statement was not false, it merely reflected

his understanding that individual School Board members had already made up their

minds as to their individual decisions to approve realignment. His view reflected what he

regarded at the time as reliable information provided to him by his relative who was the

Vice President of the Madison-Grant Teacher's Association. Even in the absence of that

information, Mr. Sizelove asserts that his statement was not made in reckless disregard of

the truth because it was not unreasonable for him to believe that the realignment plan

would not return as a proposal for School Board action until it had the support of a

majority of the members. After all, he argues, realignment was not a new issue: there had

been numerous public forums over the span of multiple years, it had been discussed at

public School Board meetings, it had the strong support of the School's administration,

and detailed preparations had originally been made for the plan to take effect in the

31

2017–2018 school year. Thus, Mr. Sizelove stresses that it was not reckless for him to believe (and to convey) that the passage of the realignment plan was a foregone conclusion, even if a public vote had not yet officially been taken.

As for Mr. Sizelove's statement that the bus routes were being revised to conform to the realignment plan, Defendants aver that the bus routes were not revised in summer of 2019 based on the realignment plan, but instead to conform to a new state law requiring that to ensure the safety of students they were to be picked up on the right side of state highways. Defendants assert that Mr. Sizelove knew his statement about revised bus routes was false, or made in reckless disregard of the truth, because the new law's effect on bus routes was a topic discussed during a public School Board meeting on July 29, 2019, and Ms. Drewitz had previously mentioned the law to Mr. Sizelove, even though Mr. Sizelove testified in his deposition that he could not precisely recall the conversation he had with Ms. Drewitz about the new law.

Mr. Sizelove characterizes his bus route comment as being intertwined with his understanding that the realignment plans already had enough support to be approved and would be taking effect in the near future such that his statement was not only not recklessly untruthful but in fact a logical conclusion resulting from his understanding of events at the time. To briefly summarize, when realignment was first contemplated in 2017, the School presented a detailed plan for the transportation of students to their new schools on multiple occasions. *See* dkt. 61-3. That year, Mr. Sizelove and at least one other bus driver were provided updated schedules on the assumption that realignment would take place. Sizelove Aff. ¶ 7. Then, when the proposal re-emerged in 2019 and Mr.

Sizelove heard from his brother's son-in-law that realignment was a "done deal," it was at the same time the School was making the statutory changes to its bus routes. Deetz Decl. at 3; Sizelove Aff. ¶ 14. Thus, Mr. Sizelove maintains that there was nothing reckless about his assumption that the re-introduction of the realignment proposal and the concurrent change in bus routes were related events.

We find that Defendants have not satisfied their burden to establish that Mr. Sizelove knew his remarks were false or that he uttered them in reckless disregard of the truth. Defendants appear to suggest that if they can demonstrate that Mr. Sizelove's speech was factually inaccurate or that he was somehow negligent in figuring out the accurate facts, his speech lacks protection and that they are entitled to summary judgment. However, this argument ignores that it is the Defendants' burden to establish the essential *mens rea* element of whether Mr. Sizelove in fact knew, or was recklessly indifferent to the fact, that his speech was false. *See, e.g.*, *Gazarkiewicz*, 359 F.3d at 942. Factual inaccuracies to the extent they occurred in Mr. Sizelove's statements are not dispositive. For example, *Pickering* involved a school employee's letter to a newspaper discussing how much money the school district was spending on athletics and criticizing his employer's budgetary priorities. *See* 391 U.S. at 581–582. The letter included provably false statements on an issue of local importance pending before a school board. *Id.* The Supreme Court concluded that the employee's discharge based on his letter violated the First Amendment because the "manner in which those statements [were] false" was "perfectly consistent with good-faith error" and because "there [was] no

evidence in the record to show that anything other than carelessness or insufficient information" was responsible for the errors. *Id.* at 572–575, 582.

The same reasoning applies here. The difference between Mr. Sizelove's contention that he stated that the School Board had "the votes in the store" versus Ms. Amos's interpretation of Mr. Sizelove's statement as conveying that the School "already approved reconfiguration" is inconsequential. The record clearly indicates that Mr. Sizelove was speaking out of his belief, after he was informed that realignment was a "done deal" by both the Vice President of the Madison-Grant Teacher's Association and a fellow fire department employee, that the realignment plan would be taking effect. Further, Defendants mischaracterize the conversation between Mr. Sizelove and Ms. Drewitz regarding the new law's change to bus routes in their attempt to show that Mr. Sizelove knew his statement was false. Mr. Sizelove, in fact, testified that while he had a vague recollection of a meeting about a new state law, he did not know if other bus routes were changed, only that his individual route was not changed. Further, although Defendants emphasize that the changed routes were discussed during a July 29, 2019 School Board meeting, Mr. Sizelove asserts, without dispute by Defendants, that he was not in attendance.

Defendants acknowledge that bus routes were changed during the summer of 2019 and further acknowledge that they never inquired as to where Mr. Sizelove obtained his information or his understanding that the realignment plan had been approved. Vore Dep. at 41. In fact, Mr. Vore acknowledged that Defendants never formed an opinion as to whether Mr. Sizelove was "intentionally lying" when he made the statements that, as

litigants in this lawsuit, they now emphatically assert are false. Vore Dep. at 41–42. The evidence establishes that Mr. Sizelove was shown plans for new bus routes when realignment was first proposed in 2017 based on the assumption that realignment would pass and then, when realignment was reintroduced in 2019 and Mr. Sizelove had been informed that it was a "done deal," he knew that the bus routes were being changed. Although the reason the routes were being changed was due to enactment of the new law, it was not reckless of Mr. Sizelove to assume that the reemergence of the realignment proposal on the agenda of the School Board, the information that it had enough support to pass, and the introduction of new bus routes were all interconnected pieces of knowledge. Clearly, Mr. Sizelove lacked all of the pertinent information concerning the realignment proposal at the time of his conversation at the firehouse, but the error in his statements was "perfectly consistent with good-faith error." Defendants have provided no evidence to show that any factual errors in Mr. Sizelove's statements were the result of "anything other than carelessness or insufficient information." *Pickering*, 391 U.S. at 572–575, 582.

In the alternative, Defendants assert that "the disparaging nature" of Mr. Sizelove's comments precludes any First Amendment protections because his comments improperly suggested that the School Board made a decision illegally outside of a public meeting, and that this question of integrity had a trickledown effect that negatively impacted other employees and morale. Defendants describe Mr. Sizelove's statements as having been "incendiary" in their effect on the public's ability to accurately assess the realignment plan. We need not dive deeply into Defendants' argument as Mr. Sizelove's comments clearly do not rise to a level that qualify as "disparaging" speech within this circuit.

35

Defendants' citations to cases involving truly outrageous, insulting, accusatory remarks are easily distinguishable from Mr. Sizelove's statements. *See Brenner*, 36 F.3d at 20 (involving a public employee's statements that a coworker was "using Gestapo tactics," "being a Hitler," "a communist," "a fascist," and "a guard dog," and implying that the coworker needed "psychiatric evaluation and counseling"); *Lalowski v. City of Des Plaines*, 789 F.3d 784, 788–89 (7th Cir. 2015) (finding that a police officer "accused . . . demonstrators of using intimidation tactics like the Taliban," "compared their use of . . . aborted-fetus signs to using an image of a priest 'bending over' a small boy to protest sexual abuse within the Catholic church," called demonstrators "a 'fat cow' several times" and told a woman that she would be beautiful "if she were not so fat"); *Cygan v. Wisconsin Department of Corrections*, 388 F.3d 1092, 1103 (7th Cir. 2004) (terminating a correctional officer because of "a well established track record of using profane and abusive language with inmates and officers alike"). Mr. Sizelove's statements that a public school's realignment plan was a foregone conclusion/had already been approved and that its bus routes were being amended are tame by any measure, especially in comparison to those cited in controlling case law where speech was justifiably determined to be disparaging. Mr. Sizelove never accused any or all of the School Board members of committing illegal behavior nor did he resort to any form of name-calling or vulgarity. Even accepting Defendants' argument that Mr. Sizelove's statements implied some sort of formal School Board approval taking place behind closed doors, such speech is far from "disparaging."

Thus, we hold that Mr. Sizelove's comments were not disparaging or made with knowledge of their falsity or in reckless disregard of the truth. We turn next to the issue of balancing the parties' interests under *Pickering*.

**ii.    *Pickering* Balancing in Favor of Mr. Sizelove**

Defendants move for summary judgment on the ground that Mr. Sizelove's First Amendment claims fail the balancing test set out in *Pickering*, which requires the Court to weigh Mr. Sizelove's interest in engaging in expressive speech against the School's interest in promoting effective and efficient public service. *See Pickering*, 391 U.S. at 568. The Seventh Circuit has set forth seven interrelated elements for consideration of a balancing of interests:

> (1) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her daily responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Gazarkiewicz*, 359 F.3d at 943–44 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)).

Mr. Sizelove contends that the balance tips in his favor as he was a bus driver, not a confidential or supervisory employee whose speech would more likely pose a threat to relationships requiring loyalty or confidence. *See Biggs v. Village of Dupo*, 892 F.2d 1298, 1303 (7th Cir. 1990). His speech occurred on his own time and away from school premises in a private conversation with three friends/acquaintances who were not

37

employed by the School. It did not appear in a published article, social media post, or statement during a public meeting. Although one of the three persons, Ms. Amos, interpreted Mr. Sizelove's comments to say that a formal vote on the realignment plan had taken place, the School was able to offer clarification to her based on the current status of the realignment proposal. Further, his comment was made to only three people; if the School felt further clarification was necessary, it surely could have provided accurate information to the two fire department employees who had been engaged in the conversation with Mr. Sizelove, as it did with Ms. Amos.

Despite these circumstances, Defendants strenuously argue that Mr. Sizelove's comments questioned the legality of the School Board action and as such they had a trickledown effect that negatively impacted other employees, their morale, and harmony. The School maintains that Mr. Sizelove used his employment as a bus driver to legitimize and extend the reach of his baseless assertions.

Defendants' arguments are simply not supported by the record before us. In fact, the School admits that it was unaware of a single person who actually expressed a belief that the School Board was acting without legal authority and Defendants have not identified any specific incidents of workplace disruption. Further, Defendants make no attempt to connect the speech for which Mr. Sizelove was disciplined to any negative impact on the workplace culture. At best, Defendants refer only generally to their ongoing concern about a detrimental effect on culture and morale. Such vague references have been explicitly rejected as insufficient to establish negative impact or damage to the workplace. *See Gazarkiewicz*, 359 F.3d at 945 ("If a general claim of disharmony could

be used by a government to insulate itself from public criticism by its employees, the First Amendment's guarantee that employees of governmental entities generally should be able to complain or criticize in order to promote governmental efficiency would be empty.") (internal quotation, citation, and alteration omitted); *see also Biggs*, 892 F.2d at 1303 (finding no significant disruption when evidence included conclusory testimony that speech "caused a lot of disruption in the department" and that the employer "felt that something had to be done to maintain morale and support").

In terms of the *Pickering* balance, Defendants' interests are virtually nonexistent. Their grounds for suspending Mr. Sizelove were entirely insubstantial, leaving the Court to assume they were indeed pretexts for the School Corporation's desire to silence opposition to its realignment proposal. "But a public employer may not 'use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." [*Rankin v. McPherson*, 483 U.S. 378, 390 (1987)]. The First Amendment prohibits such misuse of authority." *Harnishfeger v. United States*, 943 F.3d 1105, 1117 (7th Cir. 2019).

Accordingly, we find that because Mr. Sizelove's statements were made as a private citizen on matters of public concern and that his interest in speech outweighed the School's speculative, hypothetical interests as an employer, his suspension violated his First Amendment rights. We turn next to the parties' arguments concerning the alleged restrictions imposed on Mr. Sizelove in addition to his administrative suspension.

**B.  Prospective Ban of "Negative of Unfavorable" Comments**

Mr. Sizelove cites the final sentence of the "Notice of Paid Administrative Leave" issued to him by the School which prohibited him from making any further comments that the School "considered negative or unfavorable," and informing him that any failure to comply with this directive could result in his termination. These restrictions, says Mr. Sizelove, constitute an improper prior restraint on his First Amendment right to free speech. Mr. Sizelove further maintains that as a result of these directives, he refrained from attending subsequent public meetings and from voicing his opinions about the school realignment plan. In response, Defendants argue that this claim has been mooted by Mr. Sizelove's departure as an employee of the School because any adjudication of these issues will result in no immediate or direct consequences on either of the parties. Alternatively, Defendants argue that the provisions set out in its administrative leave letter comport with Seventh Circuit precedent.

### i.  Mr. Sizelove's Prior Restraint Claim is Not Moot

Regarding Defendants' mootness argument, Defendants suggest that because Mr. Sizelove is no longer an employee of the School, any claim related to limits imposed on his future employment-related speech are moot. Dkt. 67 at 16–18. This argument fails to take into account the fact that Mr. Sizelove remained employed by the School for eight additional months following his administrative suspension. Mr. Sizelove does not seek injunctive relief from the School's ban on his future speech, given that he is in fact no longer employed by the School, but he does seek an award of damages arising from the imposition of the ban from August 2019 until his April 2020 termination. During that period, his speech, he claims, was "chilled" due to the restrictions on his future

expressive rights. *See* dkt. 61- 1 at 6–7. Mr. Sizelove has clarified that "future speech" in this context refers to his speech following the unreasonably expansive restraint on his future comments foreclosing anything that the School might consider negative or unfavorable. Dkt. 68 at 5 n.7

We agree that Mr. Sizelove's claim of prior restraint on his speech is viable and, if ultimately determined to be well-taken, damages may be available to compensate him for the injury he suffered when the exercise of his rights was chilled. "When a claim for injunctive relief is barred but a claim for damages remains, a declaratory judgment as a predicate to a damages award can survive." *Crue v. Aiken*, 370 F.3d 668. 677–78 (7th Cir. 2004) (citations omitted). Mr. Sizelove's claim for damages resulting from the imposition of the prior restraint concerning "negative or unfavorable" comments is not moot. *Wernsing v. Thompson*, 423 F.3d 732, 745 (7th Cir. 2005) (citing *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *Crue v. Aiken*, 370 F.3d at 677–78). Because we find that Mr. Sizelove has asserted a cognizable claim of injury giving rise to damages he allegedly sustained during the eight months he was employed by the School following his suspension, we turn next to the merits of his prior restraint claim.

### ii. The School's Administrative Leave Letter Constituted a Prior Restraint in Violation of Mr. Sizelove's First Amendment Rights

Mr. Sizelove accurately describes the language in Defendants' administrative leave letter as a wide-ranging *prior* restraint on his speech, thereby requiring the School to satisfy a "greater burden" than that required by *Pickering*, given that *Pickering* applies to *post hoc* speech-related employment decisions. *See, e.g.*, *Wernsing*, 423 F.3d at 747;

*Crue*, 370 F.3d at 678; *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 749-50 (7th Cir. 1999). Mr. Sizelove cites the standard in *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) ("*NTEU*"), which held that, in the context of a ban on future speech in an employment context, "the general *Pickering* approach was proper with some modification to account for the differing interests involved in a case of prior restraint." *Milwaukee Police Ass'n.*, 192 F.3d at 749. This distinction flows from the fact that the impact of a prior restraint is typically more substantial and impactful than a single disciplinary decision, thus chilling potential speech rather than punishing speech that has already occurred. *NTEU*, 513 U.S. at 468. In *NTEU*, the government was required to demonstrate that "the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (citing *Pickering*, 391 U.S. at 571); *see also Milwaukee Police Ass'n.*, 192 F.3d at 750 (noting that *NTEU*'s test "recognizes the government's interest when acting as an employer in the efficiency of its workplace, while also acknowledging the greater risk posed to expression by a ban on speech").

Defendants do not address the holding in *NTEU*. They merely contend that the language in the administrative leave letter comports with federal law because the words "negative and unfavorable" are logically interchangeable synonyms of the words "outrageous, unsupported, profane, disparaging, disrespectful, unruly, and harsh—all of which the Seventh Circuit affirms are not protected by the First Amendment." Dkt. 67 at 19; *see also Brenner*, 36 F.3d at 20; *Lalowski*, 789 F.3d at 789. Mr. Sizelove responds

noting that the two cases Defendants cite as their sole support for the permissibility of the language in the letter—*Brenner* and *Lalowski*—involved highly distinguishable facts from those before us and that neither case applied the standard set out in *NTEU* or concerned a prior restraint on speech. Mr. Sizelove argues that none of the proposed synonyms used in *Lalowski* and *Brenner* are *actual* dictionary-recognized synonyms, but, even if they were, Defendants' argument that the government may impose an outright ban on "disrespectful" or "harsh" employee speech is unsupportable under *NTEU*.

When applying the *NTEU* balancing test, we look first to the interests of the School Corporation that would be or were threatened by the challenged speech. Again, the School makes no argument utilizing or applying the analysis set out in *NTEU*, focusing instead solely on its *Pickering* interests and Mr. Sizelove's administrative suspension. The School suggests that its concern with Mr. Sizelove's speech was that he was spreading false information which the School construed as an attempt to harm its efforts to pass the realignment proposal. The School was also concerned that Mr. Sizelove's comments would have a "trickle down" negative effect impacting employee morale and workplace culture. Mr. Sizelove stresses that the interest of the public in hearing unrestrained debate on a controversial proposal such as the school realignment plan should be and is paramount and the School has not directly refuted the importance of this interest.

In the context of a broad prior restraint on speech, we examine whether the threatened negative impact of the speech on the actual operation of the School Corporation outweighs Mr. Sizelove's right to free expression on a matter of public

concern. "First, we note that the fact that the [School Corporation] might or might not like the speech cannot ultimately control a First Amendment issue like this. This is especially true where, as here, the mission of the [School Corporation] is not related to the purpose of the speech." *Crue*, 370 F.3d at 679–80.

Defendants have adduced no evidence that "negative or unfavorable" comments by Mr. Sizelove did or would likely create the "necessary impact on the actual operation of the Government," *NTEU*, 513 U.S. at 468 (internal quotation omitted), such as is required to justify the School's broad proscription. *See Harnishfeger*, 943 F.3d at 1113–1114. The prospective ban on Mr. Sizelove's speech did not connect any "negative or unfavorable comments" by him to any impact on the School's operations. Nor did the School impose a similar restriction on any other employee's speech, which suggests that Mr. Sizelove's speech had been singled out by this prohibition. Accordingly, we find that the prior restraint on his speech did not comply with the standards set out in *NTEU*.

Even if analyzed under the less demanding framework of *Pickering*, a public employee's "public criticism of his superiors on a matter of public concern may be constitutionally protected and may, therefore, be an impermissible basis for [adverse] employment [action]." *Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (citing *Pickering*). Recall that in *Pickering* the Supreme Court determined that a constitutional violation had occurred when a teacher published an attack on a school board's handling of financial resources. 391 U.S. at 566.

Here, the School Corporation did not limit its prospective prohibition to the size of Mr. Sizelove's audience or to the subject-matter of his criticism. Additionally, the

School's administrative leave notice restricted Mr. Sizelove from making comments that the School would "consider[] negative or unfavorable," which violates the requirement that any prior restraint on speech be "narrow, objective, and definite standards" to guide the exercise of governmental discretion. *See, e.g.*, *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 & n.2 (1969) (collecting cases). The subjective nature of this restraint also supports Mr. Sizelove's contention that the letter led him to self-sensor, especially given his awareness that the School's administration was highly supportive of the school realignment plan. Considering all these factors, it is clear that even if *Pickering* (rather than *NTEU*) set out the proper framework for analyzing the prospective ban, the restrictions imposed on Mr. Sizelove's free speech rights under the First Amendment were clearly violated.

Thus, we hold that the School's disciplinary actions against Mr. Sizelove, both in suspending him and in prohibiting him from making any further negative or unfavorable comments, violated his First Amendment rights. We turn next to address the parties' remaining claims and contentions.

### C. Individual and Official Capacity Claims Against Defendant Steven Vore

Defendants contend that the claims against Mr. Vore individually must be dismissed because he is protected by qualified immunity. In addition, Defendants argue that these claims against Mr. Vore are impermissibly duplicative. For the reasons explicated below, we find that Mr. Vore's actions were/are not shielded by qualified immunity and that Mr. Sizelove's claim against Mr. Vore in his individual capacity may

proceed. However, the claim against Mr. Vore in his official capacity is indeed
duplicative, requiring dismissal of the official-capacity claim brought against Mr. Vore.

### i. Mr. Vore is Not Entitled to Qualified Immunity

Defendants assert that Mr. Sizelove's claims against Mr. Vore must be dismissed
because his actions are shielded by qualified immunity. "[Q]ualified immunity shields
officials from civil liability so long as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person would have known. This
'clearly established' standard ensures that officials can reasonably . . . anticipate when
their conduct may give rise to liability for damages." *Est. of Green v. City of
Indianapolis*, 420 F. Supp. 3d 816, 821–22 (S.D. Ind. 2019) (citations and quotations
omitted); *Landstrom v. Illinois Dep't of Child. & Fam. Servs.*, 892 F.2d 670, 674–75 (7th
Cir. 1990) (stating that "in the light of pre-existing law the unlawfulness must be
apparent" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1986))).

Defendants contend that Mr. Vore is protected by qualified immunity because he
did not violate clearly established constitutional law when he disciplined Mr. Sizelove for
comments he made about the School Corporation that Mr. Vore believed were false. Mr.
Sizelove rejoins that, under federal law, it was clearly established that Defendants must
be able to establish that the statement was made with <u>knowledge</u> of its falsity or <u>in
reckless disregard</u> of the truth prior to disciplining a public employee for allegedly false
statements concerning matters of public concern and occurring outside of the workplace.
Mr. Sizelove emphasizes that Mr. Vore specifically testified that he did not have any
view with regard to Mr. Sizelove's mental state when Mr. Sizelove made the comments

for which he was disciplined. Vore Dep. at 41–42. Mr. Sizelove further maintains that it was clearly established under *Pickering* that the School was required to provide a specific showing of the disruptiveness of the employee speech at issue before punishing or restricting it, which the School did not do. Additionally, Mr. Sizelove argues that it was clearly established at the time of his suspension that a broad, prospective ban on all comments "that are considered negative or unfavorable" is violative of the First Amendment.

"To overcome qualified immunity, a plaintiff 'must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was "clearly established" at the time of the official's alleged misconduct.'" *Est. of Green*, 420 F. Supp. 3d at 824 (S.D. Ind. 2019) (quoting *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013)). For the reasons previously explicated, we hold that element one has been satisfied: Defendants' actions violated Mr. Sizelove's First Amendment rights. Thus, the next question is whether Mr. Vore's disciplinary actions against Mr. Sizelove violated clearly established statutory or constitutional rights of which a reasonable person would have known at the time Mr. Sizelove was administratively suspended and prohibited from future negative speech. Where, as here, the constitutional law involves a balancing test such as that in *Pickering* and *NTEU*, there is "a wide gray area between the clearly legal and the clearly illegal, and the rules of qualified immunity require giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area." *Harnishfeger*, 943 F.3d at 1120 (quoting *Gustafson*, 117 F.3d at 1021 (internal quotation marks omitted)). "[G]overnment officials are not expected to be prescient and

are not liable for damages simply because they legitimately but mistakenly believed that the balancing of interests tipped in the State's favor." *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995). Even so, it is clearly established that "the public employer's side of the *Pickering* balance must be supported with evidence of actual disruption, or at least the articulation of a reasonable belief in future disruption plus evidence of its reasonableness at the time." *Harnishfeger*, 943 F.3d at 1121 (citing *Gustafson*, 290 F.3d at 913; *Hulbert v. Wilhelm*, 120 F.3d 648, 655 (7th Cir. 1997); *Dahm*, 60 F.3d at 258.

We hold that pursuant to clearly established law in effect in August 2019, Mr. Sizelove's speech was protected. It was speech occurring away from the work premises among three of Mr. Sizelove's acquaintances, none of whom was employed by the School Corporation, concerning a matter of quintessential public concern and debate. There is no evidence to support that Mr. Sizelove made his comments with knowledge of their falsity or in reckless disregard of the truth; recall that Mr. Vore testified that he had "no opinion" as to Mr. Sizelove's mental state at the time the comments were made and, when he was informed of Mr. Sizelove's comments by way of Dr. Deetz, he did not even know for sure if Ms. Amos had been present at the time the comments were made. Vore Dep. at 40; *see also Harnishfeger*, 943 F.3d at 1121 (collecting cases).

Clearly established law in August 2019 held that:

the public employer's side of the *Pickering* balance must be supported with evidence of actual disruption, or at least the articulation of a reasonable belief in future disruption plus evidence of its reasonableness at the time. *Gustafson*, 290 F.3d at 913; *see also Hulbert v. Wilhelm*, 120 F.3d 648, 655 (7th Cir. 1997) (denying qualified immunity: "*Connick* reiterated *Pickering*'s rule that the mere incantation of the phrase 'internal harmony in the workplace' is not enough to carry the day, and the

48

Pierce County defendants appeared to have relied on nothing more substantial than that."); *Dahm v. Flynn*, 60 F.3d 253, 258 (7th Cir. 1994) (reversing in part grant of qualified immunity defense: "Not only did Flynn fail to identify how Dahm's testimony impeded the efficient operations of the Lottery, but the precise opposite would seem to have motivated the Wisconsin legislature to invite Dahm to testify[.]").

*Harnishfeger*, 943 F.3d at 1121.

The *Pickering* analysis, when applied to these facts, establishes that, although Defendants were apparently concerned with the "trickle down effect" of Mr. Sizelove's comments on other employees and morale, there is no evidence of any specific disruptions at the time the comments were made or during the ensuing eight months while Mr. Sizelove was still employed by the School. In fact, the School has made no rational connection between Mr. Sizelove's comments and its assertion that the School Board's credibility or the legality or legitimacy of its decisionmaking process was challenged, given the lack of evidence that any employee or member of the community even knew Mr. Sizelove made these statements or had on that basis questioned the School Board's legitimacy at any point for any reason. On the record before us, the School's belief that Mr. Sizelove was "spreading false news to the public" was not objectively reasonable. If a public official believes that a ministerial employee's statement requires clarification, "the remedy to be applied is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring).

In reading between the lines of the evidence adduced here, we infer that the School Corporation became frustrated with Mr. Sizelove's opposition to the

49

realignment plan and sought to staunch his opposition to the plan within the community when the plan was reintroduced for a vote in 2019. The timing of Mr. Sizelove's paid administrative suspension, which ended on August 26, 2019—the very day that the School Board conducted a public meeting to formally reconsider the realignment plan—reinforces the conclusion that Mr. Vore's decision to discipline Mr. Sizelove for his statements was an attempt to prevent his and perhaps others' opposition to the plan from reaching the public, not because of any disruption his speech had specifically threatened or actually inflicted upon Defendants or the School culture.

In the absence of any evidence that Mr. Sizelove's comments had any of the generalized, vague disruptive effects that the School cites as its reasonable basis for Mr. Vore to issue discipline, Mr. Vore is not entitled to qualified immunity. Accordingly, Mr. Sizelove is entitled to pursue his individual-capacity claim against Mr. Vore.

### ii.  Plaintiff's Official-Capacity Claim Against Mr. Vore is Duplicative

Defendants have sought the dismissal of Mr. Vore's official capacity claim on the additional ground that the claim is duplicative. Mr. Sizelove has named Mr. Vore as a defendant in both his individual and official capacities and has separately named the School Corporation as a defendant. As Defendants correctly note, the claims against Mr. Vore in his official capacity as Assistant Superintendent of the School Corporation and against the School Corporation itself are redundant. A claim against an individual in his official capacity is "in all respects other than name, to be treated as a suit against the

[municipal] entity . . . for the real party in interest is the entity." *Kentucky v. Graham,* 473 U.S. 159, 165–66 (1985). Accordingly, because the School Corporation is the real party in interest, the official-capacity claim against Mr. Vore shall be dismissed as duplicative of the claim against the School Corporation.[12] *See, e.g., Bramley v. Miller*, No. 1:20-cv-01064-TWP-TAB, 2020 WL 2396007, at *2 (S.D. Ind. May 12, 2020) (§ 1983 claim against employees in their official capacity "dismissed as duplicative" of the claim against their employer); *Ball v. City of Muncie*, 28 F. Supp. 3d 797, 802 (S.D. Ind. 2014).

### iii.   Plaintiff's Individual Capacity Claim Against Mr. Vore is Not Duplicative

Defendants maintain that if the individual capacity claim against Mr. Vore is allowed to proceed it will potentially permit a windfall recovery because that claim seeks the same relief as that sought against the School Corporation, namely, injunctive relief and compensatory and statutory damages. Defendants observe that Mr. Sizelove stands to gain nothing additional based on his claim against Mr. Vore. In response, Mr. Sizelove maintains that he is not seeking a double recovery; rather, he seeks a judgment that holds both the School Corporation and Mr. Vore independently liable for his resulting damages. Since there is no legal basis for dismissing the individual-capacity claims against Mr. Vore when two defendants may be held joint and severally liable for the same damages,

---

[12] We reject Mr. Sizelove's argument that his official-capacity claim is not duplicative because Defendants may argue, at some point in the future of this litigation, that the School Corporation may not be held liable under the *Monell* doctrine. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978). Mr. Sizelove maintains that an official-capacity claim against Mr. Vore protects his interests if the School's liability is barred by *Monell*. However, Defendants have not raised a *Monell* defense in their request for summary judgment and we are not persuaded by Mr. Sizelove's unsupported contention that claims against the Office of the Superintendent of the School Corporation can not be equated with the School Corporation itself.

there is no entitlement on the part of one or the other of the defendants to dismissal on that basis. *See Harper v. Albert*, 400 F.3d 1052, 1061–62 (7th Cir. 2005).

An individual is liable in a § 1983 action only if he caused or participated in a constitutional deprivation. *Martin v. Copeland*, No. 2:16-cv-59-JVB-JEM, 2017 WL 168958, at *3 (N.D. Ind. Jan. 17, 2017) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983)). "The mere fact that an individual who causes a constitutional deprivation is an official employed by a government entity does not insulate that individual from individual-capacity liability." *Martin*, 2017 WL 168958, at *4 (citing *Hafer v. Melo*, 502 U.S. 21, 27–28 (1991)). "Nor is an individual-capacity claim duplicative of a claim against the government entity." *Id.* Thus, the relevant question is whether Mr. Vore caused or participated in the constitutional deprivation of Mr. Sizelove's rights. *See id.* (citing *Wolf-Lillie*, 699 F.2d at 869). On the record before us the answer is clear: Mr. Vore was directly involved in the events leading up to Mr. Sizelove's discipline—making the decision, along with Dr. Deetz, to suspend Mr. Sizelove and imposing the restrictions on his future speech. Mr. Sizelove's evidence is sufficient to support his individual-capacity claim against Mr. Vore.

**D.    Defendants Are Not Entitled to Summary Judgment Based on Mr. Sizelove's Insufficiently Alleged Damages Claim**

Defendants next assert that they are entitled to summary judgment on the basis that Mr. Sizelove has not suffered any recoverable damages, given that his claim of emotional and other harm is not sufficiently specific and his request for injunctive relief lacks a threat of imminent injury. They also seek summary judgment as to Plaintiff's

claimed damages based on the after-acquired evidence doctrine. We agree that Mr. Sizelove's claims of emotional and reputational harm lack evidentiary support, but Mr. Sizelove has established an entitlement to injunctive relief and an award of nominal damages for the constitutional violations.

### i. Mr. Sizelove's Claim of Emotional and Other Damages is Insufficient

The School Corporation asserts that, even if it is found to have violated Mr. Sizelove's constitutional rights, the undisputed facts reveal that no monetary recovery is available to him based on that deprivation because he has not suffered any actual damages. In that sense, they say, his First Amendment claims are "doomed." Dkt. 59 at 19–24. We begin with the fact that the undisputed evidence establishes that Mr. Sizelove suffered no lost wages or termination of employment type pecuniary injury because his School-imposed discipline consisted of his being placed only on *paid* administrative leave.

An absence of pecuniary damages does not defeat a claim based on "[a] deprivation of First Amendment rights [which] standing alone is a cognizable injury," however. *Lewis v. McCracken*, 782 F. Supp. 2d 702, 713–14 (S.D. Ind. 2011) (quoting *Rowe v. Shake,* 196 F.3d 778, 781 (7th Cir. 1999) (internal quotation marks omitted)). Defendants' violation of Mr. Sizelove's First Amendment rights by suspending him and by issuing a prior restraint that chilled his speech and led him to self-censor and separate himself from involvement in public debate on a matter he cared deeply about caused him to incur a compensable injury. That said, Mr. Sizelove is not entitled to recover damages "based on some abstract value or unspecified importance associated with this

constitutional right, an injury to his First Amendment rights, [which] nonetheless may 'be compensated through substantial money damages.'" *Id.* at 714 (quoting *City of Watseka v. Illinois Public Action Council,* 796 F.2d 1547, 1559 (7th Cir. 1986)). Thus, while Defendants are not entitled to summary judgment on this issue, Mr. Sizelove is entitled to an award of only nominal damages resulting from the School's infringement on the exercise of his First Amendment rights. *See, e.g.*, *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978); *Smith v. City of Chicago*, 913 F.2d 469, 474 (7th Cir. 1990).

Mr. Sizelove's claim of emotional and reputational damages lacks evidentiary support, as we have previously noted. His claim of reputational damage resulted from an alleged unsourced rumor (some might term it "gossip") that his suspension was the result of his physically assaulting a child on his bus route. His claimed emotional injury presented as distress over being separated from the students for one week and from headaches and stress and reduced appetite and feelings of anger, all of which are vague, conclusory, undocumented, and in certain respects clearly exaggerated. What he experienced was far less than degrading or humiliating by any objective measure. *See* Sizelove Dep. Vol. 1 at 56–57; Sizelove Dep. Vol. 2 at 128–29, 140; Sizelove Aff. ¶ 22.

No evidence was adduced to establish that Mr. Sizelove was required to seek medical care or assistance from a mental health professional in relation to his alleged symptoms. *See* Sizelove Dep. Vol. 1 at 141–143. "When the injured plaintiff's testimony is the only proof of emotional damages, [he] must explain the circumstances of [his] injury in reasonable detail; [he] may not rely on conclusory statements." *Stevens v. Hous. Auth. of S. Bend, Indiana*, 663 F.3d 300, 308 (7th Cir. 2011) (citing *Denius v.*

54

*Dunlap,* 330 F.3d 919, 929 (7th Cir. 2003); *Alston v. King,* 231 F.3d 383, 388 (7th Cir. 2000)). Such testimony must be supported by evidence of "'demonstrable emotional distress,' and may not simply point to circumstances of the alleged constitutional violation which might support an inference of emotional injury." *Id.* (quoting *Alston*, 231 F.3d at 388). However, "an injured person's testimony may, by itself or in conjunction with the circumstances of a given case, be sufficient to establish emotional distress without more." *Alston*, 231 F.3d at 388.

> [I]n determining whether the evidence of emotional distress is sufficient to support an award of damages, we must look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused that distress.... The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional distress.

*Stevens*, 663 F.3d at 308 (quoting *United States v. Balistrieri,* 981 F.2d 916, 932 (7th Cir. 1992)).

We find that Mr. Sizelove's alleged symptoms emanating from the lenient disciplinary action taken against him in the form of an administrative suspension of his duties extending over a single week *with pay* along with a complete absence of any specific reputational damage or requirement of supportive mental health care or physical treatment undermine his claim for compensable monetary damages because there was no actual injury proven. *See, e.g.*, *Biggs*, 892 F.2d at 1305 ("A single statement by a party that he was 'depressed,' 'a little despondent,' or even 'completely humiliated' . . . is not enough to establish injury."); *Denius*, 330 F.3d at 929 (finding plaintiff's testimony that

he was concerned, troubled, embarrassed, and humiliated by the circumstances in which he was fired insufficient when the facts underlying the case were not inherently degrading or humiliating).

Accordingly, Mr. Sizelove's claimed entitlement to damages based on emotional distress and reputational harm resulting from his suspension with pay is unavailing based on the dearth of evidence adduced here.

### ii.   Request for Injunctive Relief/Subsequent Improper Conduct

Mr. Sizelove has also sought injunctive relief, namely, the expungement and/or rescission from his personnel record of his unconstitutional suspension. Defendants rejoin that because Mr. Sizelove faces no immediate threat of any adverse employment action based on his record and has not identified any specific prospective employer who might be deterred from hiring him due to his employment-related discipline, and also because subsequent alleged improper conduct would preclude him from returning to employment with Defendants, injunctive relief is inappropriate and unavailable under the after-acquired evidence doctrine.

Defendants' arguments opposing Mr. Sizelove's entitlement to injunctive relief include references to the reasons for Mr. Sizelove's termination eight months after the speech-related discipline at issue in this lawsuit—reasons wholly unrelated to the First Amendment claims before us.[13] Defendants invoke the rarely employed "after-acquired

---

[13] For example, Defendants emphasize that a future employer would likely be more concerned about certain criminal charges brought against Mr. Sizelove than about the employment-related discipline in this case. Defendants describe in detail the charges against Mr. Sizelove, repeatedly weaving them into their briefing. These criminal charges are completely unrelated to the reasons

evidence doctrine"[14] in an attempt to bar to Mr. Sizelove's claim. Dkt. 59 at 23–24. The

after-acquired evidence doctrine ordinarily is applied in the context of a terminated

employee seeking back pay, front pay, or reinstatement, which are remedies clearly not

sought by Mr. Sizelove here. Mr. Sizelove does not challenge his termination, does not

seek reinstatement, nor does he seek front pay or back pay. The School maintains that if it

had learned previously of the investigation into Mr. Sizelove's alleged criminal conduct it

would have terminated his employment, that argument besides being entirely

hypothetical and speculative is irrelevant to the speech-related reasons for Mr. Sizelove's

suspension. This "after-acquired evidence" bears no connection to the injunctive relief

sought by Mr. Sizelove.

      Defendants assert that Mr. Sizelove's request for injunctive relief must be denied

because there is no showing that his suspension has deterred (or would deter) a

---

why Mr. Sizelove was suspended for his speech. Defendants' references to Mr. Sizelove's alleged criminal activity seem to have been motivated by a nefarious, vindictive motive. Because the issues before us involve Mr. Sizelove's First Amendment rights, a subsequent unrelated criminal investigation is not relevant and we discuss the details no further.

[14] This doctrine holds that "the after-acquired evidence of the employee's wrongdoing bears on the specific remedy to be ordered. Equity's maxim that a suitor who engaged in his own reprehensible conduct in the course of the transaction at issue must be denied equitable relief because of unclean hands." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 360 (1995). "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *McKennon*, 513 U.S. at 363; *Powers v. Chicago Transit Auth.*, 890 F.2d 1355, 1360 (7th Cir. 1989). Under the after-acquired evidence doctrine, "there is no right to backpay if in the course of litigation over a discriminatory or otherwise unlawful discharge the employer unearths evidence that, had he known it at the outset, would have caused him, without fault, to refuse to hire the employee." *Hartman Bros. Heating & Air Conditioning, Inc. v. NLRB*, 280 F.3d 1110, 1115 (7th Cir. 2002); *see also McKennon*, 513 U.S. at 361-63. This is an equitable doctrine that "allow[s] courts to fashion remedies tailored to the circumstances of the case, within the bounds of governing precedent." *Smith v. Davis*, 953 F.3d 582, 599 n.9 (9th Cir. 2020).

prospective employer from hiring him on that basis. Mr. Sizelove rejoins that he is entitled to have his suspension redacted from his employment record since it occurred in violation of his First Amendment rights. In addition, because a statute of limitations would bar him from seeking this relief at some future time, he stands to be harmed by the record of this disciplinary action when and if he applies for other employment in the future.

A plaintiff is entitled to permanent injunctive relief in addition to success on the merits upon a showing that he will suffer "irreparable harm" absent an injunction, "that the benefits of granting the injunction outweigh the injury to the defendants," and "that the public interest will not be harmed by the relief requested." *Collins v. Hamilton*, 349 F.3d 371, 374 (7th Cir. 2003). Mr. Sizelove has succeeded on his claim that Defendants violated his First Amendment rights, which includes a finding of irreparable harm. *Allen v. Bartholomew Cty. Ct. Servs. Dep't*, 185 F. Supp. 3d 1075, 1086 (S.D. Ind. 2016) ("'[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,' and the 'quantification of injury is difficult and damages are therefore not an adequate remedy.'" (internal citations omitted)). Mr. Sizelove maintains that the expungement of his disciplinary record would likely benefit his attempts to obtain future employment. We assume that neither the School nor certainly the public has any legitimate or just interest in maintaining a disciplinary record found to have contravened an individual's Constitutional rights. Mr. Sizelove is entitled to receive this relief and to receive it now. *See, e.g.*, *Charleston v. McCarthy*, 926 F.3d 982, 989-90 (8th Cir. 2019) (holding that the statute of limitations begins to run from the

time of an employee's suspension and not from the subsequent denial of a request that that suspension be rescinded). Injunctive relief is the best means of redress. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) ("marred" disciplinary record "is a continuing harm for which he can seek redress") (citing cases); *Doe v. Cummins*, 662 Fed. App'x 437, 444 (6th Cir. 2016) (order compelling the removal of "a negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007).[15] Accordingly, we hereby direct the School to expunge, redact, and/or rescind the record reflecting the unconstitutional disciplinary action taken against Mr. Sizelove and summary judgment shall enter in favor of Mr. Sizelove as to his request for injunctive relief.

## III.   Plaintiff's Motion to Strike Defendants' Supplemental Brief

On January 24, 2022, without having sought leave of Court to do so, Defendants filed a Supplemental Brief in Support of Defendant's Motion for Summary Judgment ("Supplemental Brief") [Dkt. 72], supported by two evidentiary submissions. Dkt. 72-1; Dkt. 72-2. Defendants maintain that their supplemental brief is warranted because leave of court is not necessary to file a supplemental summary judgment brief after newly discovered facts arise and in any event their brief does not raise new arguments or identify facts that should have (or could have) been included during regular summary judgment briefing. Defendants seek in this fashion to bring to the Court's attention to the

---

[15] We note that these cases arise in the context of student disciplinary records as opposed to employee disciplinary records, but we find this a distinction without a difference. Indeed, it seems *more* probable that prospective employers would inquire about and be concerned about on-the-job discipline of a potential employee than to the discipline of a student.

fact that additional criminal charges have been brought against Mr. Sizelove, which they assert bears on his entitlement to some form of equitable remedy. Dkt. 74 at 3–4.

Mr. Sizelove has moved to strike Defendants' supplemental brief, arguing that the criminal charges bear no relevancy to Mr. Sizelove's employment with the School Corporation and that the School Corporation is attempting to use these new charges to bolster its arguments relative to the "after-acquired evidence doctrine." *See* dkt. 73 at 2–3.

Defendants' supplemental brief shall be stricken; it was improperly filed without leave of the Court and concerns a criminal investigation that has no bearing on the injunctive relief sought by Mr. Sizelove because Mr. Sizelove has not challenged his termination. As we have determined, *supra*, the after-acquired evidence doctrine is inapplicable to the evidence and claims for relief before us.[16] Thus, we GRANT Plaintiff's Motion to Strike Defendants' Supplemental Brief [Dkt. 73].[17]

## IV.   Conclusion

For the reasons outlined above, Defendants' Motion for Summary Judgment [Dkt. 58] is GRANTED IN PART, specifically with respect to Plaintiff's claim against Defendant Vore in his official capacity. Plaintiff's Cross-Motion for Summary Judgment

---

[16] In a similar vein, Defendants filed a Motion for Leave to Serve Discovery on March 14, 2022, seeking: (1) the video recording of Mr. Sizelove's interview confessions to the Indiana State Police in April 2020 regarding unrelated criminal charges, and (2) documents exchanged with the State of Indiana in a recently filed December 2021 criminal unrelated to Mr. Sizelove's First Amendment claims. Defendants maintain that this evidence relates directly to Mr. Sizelove's claims of reputational harm, the timeline of events in this litigation, his credibility, and Defendants' after acquired evidence argument. Dkt. 75 at 6. For the reasons already set forth, we have found that Mr. Sizelove did not establish damages regarding harm to his reputation. Thus, we DENY Defendants' Motion for Leave to Serve Discovery. [Dkt. 75].

[17] Defendants, in the alternative, request leave to file a supplemental summary judgment brief. [Dkt. 74 at 5]. We deny this request as moot in light of our rulings in this opinion.

[Dkt. 61] is GRANTED IN PART. In all other respects, the respective summary judgment motions are DENIED. Plaintiff is entitled to a declaratory judgment holding that Madison-Grant School Corporation and Defendant Steven Vore, in his individual capacity, violated Plaintiff's First Amendment rights; accordingly, the Court shall award damages in Mr. Sizelove's favor but only in the nominal amount of one hundred dollars ($100.00) plus costs.

With respect to Plaintiff's request for injunctive relief, Defendant Madison-Grant United School Corporation is ORDERED to expunge/redact or otherwise delete any notation, record, or employment file referencing Plaintiff's administrative suspension to be completed **within 45 days** of the date of this Order. Consistent with the Seventh Circuit's directions in *MillerCoors LLC v. Anheuser-Busch Companies, LLC*, Nos. 19-2200, 19-2713 & 19-2782, 2019 WL 5280872, at *1 (7th Cir. Oct. 18, 2019), this injunction shall be set forth in a separate Order without reference to any other document.

Finally, Plaintiff's Motion to Strike Defendants' Supplemental Brief [Dkt. 73] is GRANTED and Defendants' Motion for Leave to Serve Discovery [Dkt. 75] is DENIED.

IT IS SO ORDERED.

Date: 4/7/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
jmayes@boselaw.com

Tyler John Moorhead
BOSE MCKINNEY & EVANS LLP
tmoorhead@boselaw.com

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org